IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COX ENTERPRISES, INC. and
COX RADIO, INC.,

Plaintiffs,

-against-

HISCOX INSURANCE COMPANY,
INC.,

Defendant.

**SECOND AMENDED COMPLAINT**

Docket No. 1:20-cv-00415-MHC

**JURY TRIAL DEMANDED**

Plaintiffs Cox Enterprises, Inc. ("CEI") and Cox Radio, Inc. ("Cox Radio") (together, "Cox"), for their complaint for Breach of Contract and Insurer Bad Faith against Defendant Hiscox Insurance Company, Inc. ("Hiscox"), allege as follows:

**NATURE OF THE ACTION**

1.     This action arises out of the bad faith failure and refusal of Hiscox to honor its obligations under a Multimedia Liability Policy it issued to CEI (the "Policy").  Hiscox agreed to insure, among other things, against losses arising out of the media activities of CEI and its subsidiary, Cox Radio.

2.     In 2016, Cox Radio, an employee of Cox Radio and a former employee of Cox Radio were all named as defendants in a lawsuit filed in Florida state court by Terry Bollea, better known as Hulk Hogan ("Bollea"), relating to their alleged

dissemination of videos (and excerpts and transcripts thereof) (the "Bollea Action"), for which CEI timely submitted a claim for insurance coverage to Hiscox (the "Claim").

3.      For three and a half years, Hiscox repeatedly acknowledged the potential for coverage under the Policy and its obligation to pay for the costs incurred in connection with the defense of Cox Radio once the Policy's retention was exhausted.

4.      However, on January 21, 2020—less than two full days before an allocation mediation between the parties was scheduled to occur, and in the middle of an ongoing mediation being held in the underlying Bollea Action—Hiscox suddenly reversed course and denied coverage for all claims asserted by Bollea against Cox Radio and purported to withdraw its numerous prior communications in which it had acknowledged potential coverage. Hiscox premised its denial on two grounds, both of which are entirely frivolous and completely irreconcilable with the facts alleged by Bollea and the language of the Policy.

5.      Despite Hiscox's denial of coverage in the middle of the mediation in the Bollea Action, Cox was able to settle Bollea's claims against Cox Radio.

6.     Due to Hiscox's improper denial of coverage and refusal to indemnify Cox, Cox was required to make the payment necessary to effectuate the settlement itself.

7.     Hiscox has not reimbursed Cox for any costs incurred in connection with the defense of Cox Radio in the Bollea Action.

8.     In this lawsuit, Cox seeks damages for Hiscox's breach of its contractual obligation to provide insurance coverage for the Claim and damages for Hiscox's bad faith under O.C.G.A. § 33-4-6.

## THE PARTIES

9.     CEI is a corporation incorporated in Delaware, with its principal place of business in Georgia.

10.     Cox Radio is a corporation incorporated in Delaware, with its principal place of business in Georgia.  During the relevant policy period, CEI owned more than 50% of Cox Radio.

11.     Hiscox is a corporation incorporated in Illinois, with its principal place of business in Illinois.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

13.    Venue in this District is proper under 28 U.S.C. § 1391(a) and (c) because the events and omissions giving rise to the controversy occurred in this District, and Hiscox transacts business and is subject to personal jurisdiction in this District.

## THE FACTS

### A.    The Policy

14.    Hiscox sold CEI the Policy, US TNT Multimedia Liability Policy No. US UAA 261.9952.11, with a policy period of December 1, 2011 to December 1, 2012.

15.    The policy was negotiated and issued in Georgia.

16.    Various individuals who were involved in the negotiation of the Policy then resided—and still reside—in or around Atlanta, Georgia.    These individuals included:  Don Stryszko, then Senior Director of Risk Management at CEI; Becky Greenhill, then Director of Risk Management at CEI; Ron Santaniello, then Senior

Client Executive at Marsh USA (CEI's broker); and Ted Twombly, then Senior Vice President at Marsh USA.

17.     The basic insuring clause for the Policy provides:

> **We** will indemnify **you** for **defense costs** and **damages** incurred as a result of a **claim** that falls within WHAT HAS TO GO WRONG (Section II) under this policy, WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE WILL PAY (Section V) under this policy.

(Policy, § 1.)

18.     To qualify for coverage, a claim must fall within the "**What has to go wrong**" section of the Policy, which provides that the Policy covers

> The performance of **media activities** by you or anyone on your behalf during the policy period results in a **claim** against you that arises from **covered media** or **advertising**, regardless of when such claim is made or where such claim is brought, and including but not limited to any claim for any actual or alleged:
>
> * * *
>
> e. infliction of emotional distress or outrage;
>
> f. breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a) - (m).

m. any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from your media content disseminated in covered media or advertising.

(Policy, § II and Endorsement 1.)

19. The Policy defines "**media activities**" as

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;
2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content**;
3. any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;
4. any digital, online, or electronic dissemination of **media content**;
5. the release, distribution, licensing, sale, lease, or exhibition of **media content**. . . .

(Policy, § VIII.)

20. "'**Media content**" is defined by the Policy as "the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such 'media content' or the medium by which such 'media content' is communicated, including but not limited to language, data,

6

facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials." (*Id.*)

21. "**Covered media**" is defined by the Policy as "All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you." (Policy at Declarations Page, § III.)

22. "**Advertising**" is defined by the Policy as "advertising, marketing, publicity, or promotion of the **insured's**, **existing subsidiary's**, or **acquired entity's** own goods and services and of the goods and services of their clients. (Policy, Endorsement 1).

23. "**You**" and "**Your**" are defined by the Policy to include "the **Insured**, any **existing subsidiary**," and "any person who was, is or becomes . . . [an] employee of the Insured [or] any existing subsidiary . . . but only in respect to claims arising out of the course and scope of their duties as such. . . ." (Policy, § VIII.)

24. "**Existing subsidiary**" is defined by the Policy to include "any entity in which the **Insured** directly or indirectly owns more than 50% of the assets or

outstanding voting shares as of the first day of the **policy period** and if the revenue is included on **your** application for this policy."  (*Id.*)

**B.    The Bollea Action**

25.    Bollea filed his initial complaint on May 2, 2016.

26.    Bollea filed the operative complaint, his second amended complaint, on January 4, 2019 (the "SAC").

27.    In the SAC, Bollea asserted nine causes of action against Cox Radio relating to an alleged conspiratorial effort among Cox Radio and its co-defendants, which include current Cox Radio employee Michael Calta ("Calta") and former Cox Radio employee Matthew Loyd ("Loyd"), to disseminate videotaped recordings (and excerpts, images and excerpts thereof) of sexual encounters between Bollea and Heather Clem, the then-wife of Tampa radio personality Bubba "The Love Sponge" Clem.

28.    Bollea alleged that all of the named "Defendants repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained video footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the 'Footage')."

29.    Bollea alleged that "[i]n March-April 2012, Defendants Loyd, Calta, Cox Radio [and others] worked in concert and conspired to leak and sell information

8

about and excerpts from the Footage to *TMZ* and *TheDirty.com*." Thereafter, TMZ published a story about the Footage and TheDirty published screen shots from and stories about the Footage.

30.     Bollea alleged that "[i]n September-October 2012, these same Defendants worked in concert and conspired to 'anonymously' send a DVD containing some of the Footage to A.J. Daulerio, then-editor of *Gawker.com*—a website notorious for posting salacious images of celebrities online in order to destroy their careers—while intending and knowing that Daulerio would post the Footage online." Thereafter, Gawker posted a video showing excerpts of the Footage.

31.     In July 2015, the *National Enquirer* published a story quoting excerpts from the footage of Bollea, which it described as coming from a court-protected, confidential transcript. The transcript contained racist comments made by Bollea. Bollea alleged that "the actions of all of the Defendants set forth herein substantially contributed to the *Enquirer*'s publication. . . ."

32.     Calta was employed by Cox during the entire relevant period—and continues to be employed by Cox. Bollea alleged that "[a]t all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc."

33. Loyd was employed by Cox when footage of the Bollea-Heather Clem encounters was sent to Gawker. Bollea alleged that when employed by Cox Radio, "Loyd . . . was acting within the course and scope of his employment by Defendant, Cox Radio."

34. Bollea further alleged that "[w]hile engaged in the misconduct alleged herein, Calta and Loyd were acting within the course and scope of their employment as 'shock jocks' for Cox, engaged in conduct of the kind they were hired to perform, within the time and space limits of their employment, and while motivated at least in part by a purpose to serve Cox."

35. The nine causes of action asserted by Bollea against Cox Radio were as follows: Invasion of Privacy (First Cause of Action); Invasion of Privacy by Public Disclosure of Private Facts (Second Cause of Action); Invasion of Privacy by Intrusion (Third Cause of Action); Intentional Infliction of Emotional Distress (Fourth Cause of Action); Intentional Interference with Contractual Relations (Fifth Cause of Action); Violation of Florida's Secure Communications Act, Section 934.10 Florida Statutes (Sixth Cause of Action); Civil Conspiracy (Seventh Cause of Action); Negligent Retention (Eighth Cause of Action); Negligence (Ninth Cause of Action).

**C.**     <u>**Settlement of the Bollea Action**</u>

36.     Three mediation sessions between Cox and Bollea were held on January 9, 2020, January 27, 2020 and February 20, 2020.

37.     An agreement-in-principle was reached at the February 20, 2020 mediation session. Under this agreement-in-principle, Cox agreed to make a payment to Bollea in exchange for a release of his claims against Cox Radio, Calta and Loyd.

38.     On February 21, 2020, Cox notified Hiscox that it had reached an agreement-in-principle with Bollea.

39.     On March 19, 2020, Cox and Bollea entered into a settlement agreement that formalized the above-described agreement-in-principle.

40.     The settlement agreement between Cox and Bollea requires Bollea to dismiss the Bollea Action against all non-defaulting defendants, with prejudice, within five business days of Bollea's receipt of the settlement payment from Cox.

41.     Cox made the settlement payment to Bollea on March 20, 2020.

42.     Hiscox's improper denial of coverage and refusal to indemnify Cox placed Cox in the position of having to make the settlement payment needed to effectuate the settlement of the Bollea Action.

43.     Bollea, Calta and Loyd have no interest in the outcome of this action because Bollea has received the settlement payment from Cox and the claims against Cox Radio, Calta and Loyd have all been released by Bollea.

### D.     The Claim Falls Squarely Within the Coverage Provided by the Policy

44.     All nine causes of action in the SAC arise from the same set of operative facts, to wit, the alleged involvement of Cox and its employees, Calta and Loyd, in various disseminations of the unauthorized recordings of Bollea (and/or excerpts, images or transcripts thereof).

45.     The Claim arises from "media activities" and both "covered media" and "advertising."

46.     As noted above, the Policy defines "media activities" to include, *inter alia*, the "gathering, acquisition, investigation, collection, researching," "compilation," "transmission, dissemination," "publication," "digital, online, or electronic dissemination," or "release" of "media content."  The Claim satisfies the definition of "media activities" because Bollea's nine causes of action were all premised on the assertion that the defendants victimized him by "obtaining, using, disclosing, disseminating, and exploiting" the Footage.   Bollea sought "redress for the damages and injuries caused by the Defendants' use, disclosure, exploitation, and public dissemination of the contents of the illegal recorded Footage."

12

47.    The Policy's definition of "media content" includes the "substance of any communication of any kind whatsoever."  The Footage, and the excerpts, images and transcripts thereof, clearly satisfy this definition.

48.    The Policy's definition of "covered media," includes "[a]ll . . . communications . . . disseminated by you."  As noted above, Bollea expressly alleged that Cox Radio and Calta and Loyd—in the scope and course of their employment at Cox Radio—disseminated the Footage.

49.    The Policy's definition of "advertising" includes "advertising, marketing, publicity, or promotion of the **insured's** . . . or **acquired entity's** own goods and services."  As Hiscox has acknowledged, "the complaint alleges that Calta and Loyd disclosed the videos to promote their broadcasts on a Cox radio station."

### E.    Notice of Cox's Claim and Hiscox's Initial Response

50.    On May 6, 2016, CEI provided notice of the Claim to Hiscox.

51.    On June 3, 2016, Hiscox issued a reservation-of-rights letter in which it acknowledged that the Claim "arises out of the dissemination of certain videos of Terry Bollea (a/k/a Hulk Hogan) engaged in sexual activity and making certain allegedly certain racist statements."

52.     Hiscox also acknowledged in that letter that Bollea alleges that Cox Radio disseminated the Footage through its "disclosure of the videos to other news outlets—such as TMZ.com and Gawker.com—for inclusion in their programming."

53.     Hiscox also acknowledged in that letter that Bollea "alleges that Calta and Loyd were acting within the scope of their employment with Cox and with the knowledge of their superiors at Cox."

54.     Hiscox also acknowledged in that letter that the claims in the Bollea Action might have arisen from the creation or dissemination of "advertising," as defined in the Policy.

55.     In that letter, Hiscox also acknowledged that the Policy is a "duty to pay policy," consented to Cox Radio's choice of Kilpatrick Townsend & Stockton LLP's Tom Clyde as defense counsel, and promised that "Hiscox will pay defense costs as incurred, once the $500,000 retention is exhausted."

F.     **Hiscox's Insistence on an Allocation, Refusal to Propose One, and Failure to Pay Any Defense Costs**

56.     On July 11, 2017, CEI's Becky Greenhill emailed Hiscox's Tara Bodden to inquire whether Hiscox still intended to pay defense costs once the $500,000 retention was exhausted.

57.     On July 20, 2017, Ms. Bodden responded to Ms. Greenhill in an email in which she stated:  "We will be reimbursing defense costs. . . .  I will need to look at allocation for non covered matters, but I need to take a peek at the complaint."

58.     Later that day, Ms. Greenhill responded to Ms. Bodden in an email in which she stated:  "We will look forward to hearing your thoughts on allocation, so that we can let our Media group know what to expect regarding reimbursement."

59.     On August 22, 2017, Ms. Bodden responded to Ms. Greenhill in an email in which she stated:  "No issue with allocation at this point."

60.     Later that day, Ms. Greenhill responded to Ms. Bodden in an email in which she stated: "Ok – thanks for confirming full defense coverage at this point."

61.     On March 19, 2018, Hiscox sent Cox a letter in which Hiscox stated: "We understand that Cox has recently exhausted the retention through the payment of defense costs.  In light of this and the development of the claim, we believe it is appropriate to discuss allocation of further defense costs."  Hiscox's March 19, 2018 letter did not propose an allocation or even identify which claims asserted in the Bollea Action it believed might not be covered.

62.     On April 19, 2018, Cox responded to Hiscox's March 19, 2018 letter with a letter in which Cox stated:  "Since Cox does not agree that this claim presents

a situation of covered and noncovered matters, Cox also does not agree with Hiscox's views on allocation."

63.    On April 18, 2019, a telephone conference was held among representatives from Cox and Hiscox.  The Cox representatives—all based in Atlanta—included Kristen Weathersby (President, Litigation at CEI), Mr. Stryszko (by then Assistant Vice President of Risk Management at CEI), Ms. Greenhill (by then Senior Director of Risk Management at CEI), and Rachel Azriel (Director of Risk Management at CEI).  On this call, Cox reiterated its position that 100% of the Claim should be covered by Hiscox and requested that Hiscox disclose its specific position.

64.    On April 30, 2019, Hiscox's then-outside counsel, Scott Bertschi, a partner at Clyde & Co LLP's Atlanta office, sent a letter stating that Hiscox "acknowledges that some of the allegations may fall within the scope of coverage" and made the "request that Cox engage in discussions to reach agreement to an appropriate allocation of defense costs."  Hiscox's April 30, 2019 letter did not propose an allocation or even identify which claims asserted in the Bollea Action it believed might not be covered.

65.    On October 17, 2019, Cox's outside counsel sent a letter to Mr. Bertschi stating that "we simply do not see any portion of the Claim not being covered under

16

the Hiscox Policy such that Hiscox may invoke the policy's allocation provision" and "request[ing] that Hiscox, in accordance with the terms of the Hiscox Policy, immediately indemnify Cox Radio for the defense costs it has incurred to date in the Bollea Action. As Hiscox has been advised, Cox Radio has incurred approximately $1.6 million in defense costs in the Bollea Action, which far exceeds the Hiscox Policy's self-insured retention."

66.     On December 27, 2019, in advance of a scheduled mediation in the underlying Bollea Action in which Hiscox had been invited to participate, Cox's outside counsel sent Mr. Bertschi an email asking for "Hiscox's position on allocation as soon as possible."

67.     On December 31, 2019, Mr. Bertschi sent a letter to Cox's outside counsel stating that "Hiscox's position is the same as it has been for years—that it is happy to discuss and come to an agreement over a reasonable allocation." Hiscox's December 31, 2019 letter did not propose an allocation or even identify which claims asserted in the Bollea Action it believed might not be covered.

68.     To date, Hiscox has not paid any of the costs incurred in defending Cox Radio in the Bollea Action.

**G.     Hiscox's Belated and Groundless Denial**

69.     On December 20, 2019, Cox learned that Ms. Bodden had left Hiscox.

17

70.     Beginning in late December 2019 or early January 2020, the person at Hiscox primarily responsible for handling the Claim was its Head of Claims in the U.S., Melissa Hill, who was based in Hiscox's Atlanta office.

71.     At the close of the January 9, 2020 mediation session in the underlying Bollea Action (which Ms. Hill attended), Cox and Bollea agreed to resume mediating on January 27, 2020.

72.     Following the January 9, 2020 mediation session, Cox and Hiscox agreed to hold a mediation relating to allocation issues in advance of the January 27, 2020 mediation session in the underlying Bollea Action.  That allocation mediation was scheduled for January 23, 2020.

73.     On January 13, 2020, Cox learned that Hiscox had hired a new law firm to provide it with outside counsel in connection with the Claim.

74.     At 6:55 p.m. on January 21, 2020, Hiscox's new outside counsel sent Cox's outside counsel a letter in which Hiscox, for the very first time, denied coverage for the Claim.  The January 21, 2020 letter stated that it "shall replace and supersede all prior communications."

75.     In the January 21, 2020 letter, Hiscox denied coverage on two grounds.

76.     First, Hiscox denied coverage on the stated grounds that while "the Bollea Footage was . . . disseminated by Loyd and/or through Calta," the "Second

18

Amended Complaint contains **NO** allegations that Cox ever acquired, collected, compiled, disseminated, or in any way publicly disclosed the Bollea Footage."

77.     Second, Hiscox denied coverage on the stated grounds that "as the dissemination of the Bollea Footage did not promote Cox's interests or programs, any **media activities** allegedly performed by Cox or on behalf of Cox did not arise from **covered media** or **advertising** as defined by the Policy."

78.     Both grounds for denial stated in the January 21, 2020 letter are frivolous and directly at odds with the explicit allegations in the SAC and the clear language of the Policy.

79.     Hiscox's first claimed basis for denial—that "Second Amended Complaint contains **NO** allegations that Cox ever acquired, collected, compiled, disseminated, or in any way publicly disclosed the Bollea Footage"—is frivolous for two reasons.

80.     First, the SAC explicitly alleged that Cox Radio, with the other defendants, "repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the 'Footage')."  The SAC further alleged that Cox Radio, with the other defendants, "worked in concert and conspired to leak and sell information

19

about and excerpts from the Footage to *TMZ* and *TheDirty.com*" and to "'anonymously' send a DVD containing some of the Footage to" Gawker.

81.     Second, the Policy defines "covered media" to include "communications . . . disseminated by you" and defines "You" to include all employees of Cox Radio in acting "the course and scope of their duties as such." Hiscox has acknowledged that Calta and Loyd are alleged to have disseminated the Footage and that such actions were allegedly taken in the course and scope of their employment for Cox Radio.

82.     Hiscox's second claimed basis for denial—that "as the dissemination of the Bollea Footage did not promote Cox's interests or programs, any **media activities** allegedly performed by Cox or on behalf of Cox did not arise from **covered media** or **advertising** as defined by the Policy"—is also frivolous for two reasons.

83.     First, Hiscox does not cite any language in the Policy stating that a dissemination can only arise from "covered media" or "advertising" if it serves to "promote Cox's interests or programs," because that supposed requirement is a mere figment of Hiscox's imagination.

84.     Second, in any event, Hiscox has acknowledged that Bollea "alleges that Calta and Loyd disclosed the videos to promote their broadcasts on a Cox Radio station."

## FIRST CAUSE OF ACTION
### (Breach of Contract)

85.     Cox repeats and realleges the allegations set forth in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.     Cox has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy and remains ready to perform all of its obligations under the Policy.

87.     Pursuant to the terms of the Policy, Hiscox is obligated to indemnify Cox for all sums that Cox has paid or has or will become obligated to pay in connection with the Claim, including the costs incurred in connection with the defense of Cox Radio in the Bollea Action once the Policy's $500,000 retention was exhausted, and the payment needed to effectuate the settlement of the Bollea Action.

88.     Hiscox has breached its obligations under the Policy by denying coverage and refusing to indemnify Cox for the costs it has incurred in connection with the defense of Cox Radio in the Bollea Action once the Policy's $500,000 retention was exhausted, and by refusing to indemnify Cox for the payment made to effectuate settlement of the Bollea Action.

89.     As a result of Hiscox's breach of its obligations under the Policy, Cox has suffered and continues to suffer damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Insurer Bad Faith – O.C.G.A. § 33-4-6)

90.     Cox repeats and realleges the allegations set forth in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

91.     The Claim is covered by the Policy.

92.     A demand for payment was made by Cox more than 60 days prior to the filing of this Complaint.

93.     Hiscox's denial of coverage and failure to pay was motivated by bad faith.

94.     As a result of Hiscox's bad faith under the Policy, Cox has suffered and will suffer damages in an amount to be determined at trial.

95.     Service upon the Commissioner of Insurance and the consumers' insurance advocate has been properly effected in accordance with O.C.G.A. § 33-4-6(b).

## PRAYER FOR RELIEF

WHEREFORE, Cox respectfully requests that the Court enter a judgment:

(a)     Awarding Cox damages against Hiscox in an amount to be determined at trial;

22

(b)    Awarding Cox all damages available under O.C.G.A. § 33-4-6, including statutory penalties and attorneys' fees, in an amount to be determined at trial;

(c)    Awarding Cox all reasonable costs incurred by Cox as a consequence of having to prosecute this action, including attorneys' fees, as well as pre-judgment interest and post-judgment interest; and

(d)    Granting Cox such other and further relief as the Court deems just and proper.

### **Jury Trial Demanded**

Cox demands a trial by jury on all Counts so triable.

Dated:  March 20, 2020                    Respectfully submitted,

                                          */s/ Joshua L. Blosveren*
                                          Joshua L. Blosveren (admitted *pro hac vice*)
                                          New York Bar No. 4142691
                                          jblosveren@hnrklaw.com
                                          Andrew N. Bourne (admitted *pro hac vice*)
                                          New York Bar No. 4172003
                                          abourne@hnrklaw.com
                                          Steven M. Silverberg (admitted *pro hac vice*)
                                          New York Bar No. 4882742
                                          ssilverberg@hnrklaw.com
                                          **HOGUET NEWMAN REGAL & KENNEY, LLP**
                                          One Grand Central Place
                                          60 E. 42nd Street, 48th Floor
                                          New York, New York 10165
                                          Telephone:  212.689.8808
                                          Facsimile:  212.689.5101

                                          Petrina A. McDaniel
                                          Georgia Bar No. 141301
                                          petrina.mcdaniel@squirepb.com
                                          Dara D. Mann
                                          Georgia Bar No. 469065
                                          dara.mann@squirepb.com
                                          **SQUIRE PATTON BOGGS (US) LLP**
                                          1230 Peachtree Street, NE
                                          Suite 1700
                                          Atlanta, Georgia 30309
                                          Telephone:  678.272.3200
                                          Facsimile:   678.272.3211

                                          *Attorneys for Plaintiffs Cox Enterprises, Inc.*
                                          *and Cox Radio, Inc.*